BARRON, Circuit Judge.
In this dispute, we must decide whether aliens who are subject to reinstated orders of removal may apply for asylum. Below, the immigration judge (“IJ”) and the Board of Immigration Appeals (“BIA”) each concluded that such aliens may not apply for asylum, even though they may be entitled to withholding of removal. The IJ and the BIA based their conclusions on certain provisions of the Illegal Immigra *30 tion Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-546 (“IIRIRA”), as well as Department of Homeland Security (“DHS”) regulations that implement those provisions. And, on that basis, the IJ and the BIA ruled that Victor Garcia Garcia (“Garcia”), a citizen of Guatemala who is subject to a reinstated order of removal, could not apply for asylum, notwithstanding that the IJ determined (and the government does not dispute) that he is entitled to withholding of removal due to the persecution he would face in his home country.
Garcia now brings these consolidated petitions for review, in which he challenges the IJ’s and the BIA’s denial of his asylum application on the ground that a key provision of IIRIRA plainly entitles him to seek asylum. He also contends that, in any event, the DHS regulations are unreasonable, insofar as they permit aliens subject to reinstated orders of removal to obtain withholding of removal but not to apply for asylum, because he contends that IIRIRA does not provide any basis for drawing such a distinction between withholding of removal and asylum. For the reasons that follow, we uphold the agency decisions below.
I.
Immigration law is distinguished by its complexity more than by its clarity. We thus need to provide some background before we turn to the merits of the legal issue that we must resolve. To do so, we first describe the distinction between withholding of removal and asylum. We then describe the relevant parts of IIRIRA— some of which might appear on first glance to be in tension with one another—and the implementing regulations. Finally, we re-eount how Garcia came to be subject to the reinstated order of removal that the IJ and the BIA ruled stands in the way of his asylum request.
A.
The distinction between withholding of removal and asylum is subtle but important. We start by describing withholding of removal.
Congress codified the right to withholding of removal in 8 U.S.C. § 1231(b)(3)(A). IIRIRA § 305; see also INS v. Aguirre-Aguirre, 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). This statute directs, in categorical fashion, that, if the Attorney General decides that an alien’s “life or freedom would be threatened” in the country to which he would be removed “because of the alien’s race, religion, nationality, membership in a particular social group, or political opinion,” then “the Attorney General may not remove an alien to [that] country.” 8 U.S.C. § 1231(b)(3)(A).[1]
The roots of this statutory provision may be traced to the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951) (the “Refugee Convention”). See INS v. Cardoza-Fonseca, 480 U.S. 421, 429, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The United States acceded to the Refugee Convention by ratifying the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (Nov. 6, 1968) (the “Refugee Protocol”). By doing so, the United States “agree[d] to comply with the substantive provisions of Articles 2 through 34” of the Refugee Convention. Cardoza-Fonseca, 480 U.S. at 429, 107 S.Ct. 1207. Article 33.1 of the Refugee Convention provides: “No Contracting State shall expel or return (‘refouler’) a *31 refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.” 19 U.S.T at 6276.[2] Thus, 8 U.S.C. § 1231(b)(3)(A) implements this “mandatory duty” of the United States as a “contracting State[ ]” to the Refugee Protocol. Cardoza-Fonseca, 480 U.S. at 429, 107 S.Ct. 1207.
We now turn to asylum. Congress codified the right to apply for asylum in 8 U.S.C. § 1158(a)(1), which provides: “Any alien who is physically present in the United States or who arrives in the United States ... irrespective of such alien’s status, may apply for asylum in accordance with this section .... ” IIRIRA § 604; see also Aguirre-Aguirre, 526 U.S. at 420, 119 S.Ct. 1439. Thus, 8 U.S.C. § 1158-lays out a “discretionary mechanism which gives the Attorney General the authority to grant the broader relief of asylum to refugees,” Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207 (emphasis in original)—that is, pursuant to 8 U.S.C. § 1101(a)(42)(A), aliens who can show a “well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” See also 8 C.F.R. §§ 208.13(b), 1208.13(b).
The roots of this statutory grant of the right to apply for asylum may also be traced to the Refugee Protocol, in which the United States acceded to the Refugee Convention. In particular, Article 34 of the Convention provides: “The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees.” 19 U.S.T. at 6276. And, as the Supreme Court has explained, Congress’s statutory mechanism for applying for asylum implements Article 34’s “precatory” language. Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207.
The upshot of the domestic statutory provisions that implement these two articles of the Refugee Convention is this: aliens who can show a “clear probability” of persecution—that is, that “it is more likely than not that the alien would be subject to persecution,” INS v. Stevic, 467 U.S. 407, 424, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984)—are “entitled to mandatory suspension of deportation,” or, as it is now known, withholding of removal, Cardoza-Fonseca, 480 U.S. at 444, 107 S.Ct. 1207 (emphasis in original). 8 U.S.C. § 1231(b)(3)(A). In contrast, aliens “who can ... show [only] a well-founded fear of persecution”—that is, refugees per the definition laid out in 8 U.S.C. § 1101(a)(42)(A)—“are not entitled to anything.” Cardoza-Fonseca, 480 U.S. at 444, 107 S.Ct. 1207 (emphasis in original). Instead, pursuant to 8 U.S.C. § 1158, such aliens merely “are eligible for the discretionary relief of asylum.” Id (emphasis in original); see also Aguirre-Aguirre, 526 U.S. at 420, 119 S.Ct. 1439 (“[WJhereas withholding is mandatory unless the Attorney General determines one of the exceptions applies, the decision whether asylum should be granted to an eligible alien is committed to the Attorney General’s discretion.”).
In Cardoza-Fonseca, the Court made clear that—given the differences between withholding of removal and asylum—the standards governing the two were necessarily different. 480 U.S. at 449-50, 107 *32 S.Ct. 1207. Specifically, the clear-probability test for triggering the United States’ mandatory duty to withhold removal is more demanding than the “well-founded fear” test that must be satisfied to trigger the Attorney General’s exercise of his discretion as to whether to grant asylum. Id.
Withholding of removal and asylum also differ in another key respect: they afford aliens distinct types of benefits. In particular, asylum, though obtainable upon a less-demanding showing, “affords broader benefits” to the recipient than does withholding of removal. Cardoza-Fonseca, 480 U.S. at 428 n.6, 107 S.Ct. 1207. As the Ninth Circuit summarizes:
Unlike an application for asylum ... a grant of an alien’s application for withholding is not a basis for adjustment to legal permanent resident status, family members are not granted derivative status, and [the relief] only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country.
Lanza v. Ashcroft, 389 F.3d 917, 933 (9th Cir. 2004) (quoting Castellano-Chacon v. INS, 341 F.3d 533, 545 (6th Cir. 2003) (second alteration in the original)). In addition, aliens granted asylum may be issued a refugee travel document, enabling them to travel outside of the United States and subsequently return. By contrast, aliens who are merely entitled to withholding of removal receive no such benefit. 8 C.F.R. §§ 223.1, 223.2. They are simply protected from being sent back to their home country. Thus, an alien who is entitled to withholding of removal may still have an interest in seeking asylum, given the greater benefits it affords an alien. See 8 U.S.C. § 1158(c)(1).[3]
Having described the distinction between withholding of removal and asylum, and the statutes that enable aliens to obtain each, we need to discuss one final statutory provision that is of direct relevance to the issue we confront here. 8 U.S.C. § 1231(a)(5)—part of section 305 of IIRIRA—states that an alien subject to a reinstated order of removal “is not eligible and may not apply for any relief under ... [chapter 12 of Title 8 of the U.S. Code], and the alien shall be removed under the prior order at any time after the entry.” 8 U.S.C. § 1231(a)(5). This provision matters here because, as the parties to this dispute agree, asylum is a form of “relief’ under chapter 12.
Thus, the question arises as to how this seemingly sweeping statutory bar to relief relates both to the seemingly categorical grant of the right to seek asylum provided to aliens in § 1158(a)(1) and to the directive to the Attorney General to withhold removal in certain enumerated circumstances that is set forth in § 1231(b)(3)(A). After all, that latter provision also appears in chapter 12.
DHS, which is now charged with administering IIRIRA, has offered its answer to that question. It has done so in regulations that attempt to harmonize the three statutory provisions—8 U.S.C. §§ 1258(a)(1), 1231(a)(5) and 1231(b)(3)(A)—along with the United States’ obligations under the Convention Against Torture (“CAT”). See United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 95 (entered into force June 26, 1987); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999); see also Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 *33 (Feb. 28, 2003) (transferring the functions of the Immigration and Naturalization Service to the Department of Homeland Security and recodifying the regulations).[4]
The regulations do so as follows. First, 8 C.F.R. § 241.8(a) requires that an alien “who illegally reenters the United States after having been removed ... shall be removed from the United States by reinstating the prior order.” That subsection further provides that such an alien “has no right to a hearing before an immigration judge in such circumstances.” Id.; see also 8 C.F.R. § 1241.8(a).
Subsection (e) of that regulation, however, then creates an “[exception.” It provides that an alien who “expresses a fear of returning to the country designated in” his reinstated removal order “shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture pursuant to § 208.31 of this chapter.” 8 C.F.R. § 241.8(e); see also 8 C.F.R. § 1241.8(e). The regulation referenced at the end of this exception, 8 C.F.R. § 208.31(e), in turn provides that:
If an asylum officer determines that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form 1-863, Notice of Referral to the Immigration Judge, for full consideration of the request for withholding of removal only.
(emphasis added); see also 8 C.F.R. § 1208.31(e).[5]
Thus, under the regulations, an alien subject to a reinstated order of removal may not apply for asylum. However, after such an alien has expressed a fear of persecution and after an asylum officer has determined that fear to be reasonable, the alien is entitled to withholding of removal to his home country if the Attorney General then decides that the alien’s life or freedom would be threatened in his home country because of a protected ground.
B.
With that legal background in place, we now turn to Garcia’s current plight. Garcia—who speaks no English and only minimal Spanish—first entered the United States unlawfully in 2004. Three years later, in 2007, immigration authorities in the United States apprehended Garcia, detained him, and then ordered him removed from this country. From all that the record reveals, it appears that Garcia would have been successful in obtaining asylum had he sought it at that time. And, it appears, too, he may have been entitled to withholding of removal. But, he did not request either asylum or withholding of removal, apparently because of the language barriers he faced and because he was uncounseled. Accordingly, Garcia was removed to Guatemala in 2007.
After returning to Guatemala, Garcia then entered the United States unlawfully for a second time in February 2015. Once Garcia had crossed the border into the United States, immigration authorities detained him. Released on his own recognizance, Garcia was permitted to travel to Massachusetts to stay with family members. Garcia was informed about two months later that his 2007 removal order would be reinstated. As the IJ noted, after *34 retaining counsel, Garcia “expressed a fear of return to Guatemala on account of his ethnicity, family membership, and religious beliefs,” and was referred to an asylum officer pursuant to 8 C.F.R. §§ 241.8(e) and 1241.8(e). See also 8 C.F.R. §§ 208.16, 1208.16 (laying out procedures for consideration of withholding of removal under 8 U.S.C.. § 1231(b)(3)(A) and under the CAT). The asylum officer conducted the required interview and concluded that Garcia had met his burden of showing a “reasonable fear of persecution.” 8 C.F.R. §§ 241.8(e), 1241.8(e).
Thereafter, Garcia’s case was referred to an IJ. In an oral decision issued on August 4, 2015, the IJ first concluded that Garcia, whom the IJ found “credible,” had met his burden, pursuant to 8 U.S.C. § 1231(b)(3)(A), of showing that “future persecution is ‘more likely than not’ to occur” in Guatemala and therefore granted Garcia’s application for withholding of removal. Specifically, the IJ found that Garcia had experienced past persecution “on account of [his] family membership as well as his ethnicity inasmuch as [] Ladino [that is, mixed-race] soldiers,” as well as government-affiliated paramilitary forces and gangs, “had targeted his village, which was comprised almost exclusively of Mayan indigenous individuals, for retaliation for the belief that these individuals were aiding or assisting in any way the guerilla movement during the civil war.” And, the IJ found, “based upon the evidence ... that the predominant Ladino element will not assist the Mayan community in fighting off the Ladino outlaw elements,” and thus that Garcia had shown “a reasonable likelihood of persecution or harm in the future by these same elements.”
But, in addition to seeking withholding of removal, Garcia had also argued to the IJ that he was eligible to apply for asylum and thus to receive the additional benefits that such relief would afford him. Garcia based this argument on the text of 8 U.S.C. § 1158(a)(1), which, he argued, enti-tied even an alien subject to a reinstated removal order to seek asylum.
In his oral decision, the IJ rejected Garcia’s argument that he was eligible to seek asylum. The IJ held that asylum is a form of “relief’ provided by chapter 12 of Title 8 of the U.S. Code and thus that 8 U.S.C. § 1231(a)(5) barred Garcia from applying for it. The IJ also held that the DHS implementing regulations supported this conclusion. Thus, the IJ concluded that, by virtue of Garcia’s reinstated removal order, and notwithstanding § 1158(a)(1), Garcia was barred from seeking asylum, regardless of whether he was entitled to withholding of removal..
Garcia then appealed the IJ’s oral ruling to the BIA. On December 1, 2015, the BIA affirmed the IJ’s decision in all respects and remanded the case so that the IJ could conduct certain background checks before ordering the withholding of Garcia’s removal. While awaiting the results of the background checks, Garcia petitioned for review in this court of the BIA’s decision denying his request to apply for asylum.
On July 6, 2016, while Garcia’s petition was pending in this court, the background • checks were completed. At that point, the IJ granted Garcia withholding of removal. In doing so, the IJ also stated that the IJ’s August 4, 2015 oral decision, which had also denied Garcia’s request to seek asylum, would become the “official opinion in this case.”
Following the IJ’s July 6, 2016 order, Garcia petitioned this court for review. Garcia also moved to consolidate that newly filed petition for review with his pending petition for review of the BIA’s December 2015 ruling that also barred him from seeking asylum. On August 18, 2016, we *35 granted Garcia’s unopposed motion to consolidate his two petitions for review.
At oral argument before this court concerning these consolidated petitions, the government agreed with Garcia that the IJ’s July 2016 order, which had been issued after the completion of the background checks, and which granted Garcia withholding of removal but barred him from applying for asylum, constituted a final order over which we have jurisdiction. We also agree with Garcia on that point, and so, our jurisdiction secure, see Cano-Saldarriaga v. Holder, 729 F.3d 25, 27 (1st Cir. 2013), we proceed to the merits.[6]
II.
Garcia’s right to apply for asylum under § 1158(a)(1) turns on “questions implicating ‘an agency’s construction of the statute which it administers.’ ” Vásquez v. Holder, 635 F.3d 563, 567 (1st Cir. 2011) (quoting Aguirre-Aguirre, 526 U.S. at 424, 119 S.Ct. 1439). We thus “apply the principles of deference described in Chevron, USA, Inc. v. Natural Resources Defense Coucil, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).” Id. (quoting' Aguirre-Aguirre, 526 U.S. at 424, 119 S.Ct. 1439) (brackets omitted).
‘We first ask whether ‘Congress has directly spoken to the precise question at issue.’ ” Succar v. Ashcroft, 394 F.3d 8, 22 (1st Cir. 2005) (quoting Chevron, 467 U.S. at 842, 104 S.Ct. 2778). “If so, courts, as well as the agency, ‘must give effect to the unambiguously expressed intent of Congress.’ ” Id (quoting Chevron, 467 U.S. at 842-13, 104 S.Ct. 2778). But if we “de-terminen Congress has not directly addressed the precise question at issue,” then we must move on to the second step of the analysis. Chevron, 467 U.S. at 843, 104 S.Ct. 2778. At this second step, “[we] do[] not simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation.” Id Rather, “if the implementing agency’s construction is reasonable, Chevron requires a federal court to accept the agency’s construction of the statute.” Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005); see also Succar, 394 F.3d at 23 (“If the statutory terms are ambiguous, then the principle of Chevron deference to the Attorney General’s choice must apply.”)
A.
Garcia contends that § 1158(a)(1) unambiguously grants him the right to seek asylum. He thus argues that he wins at Chevron’s first step.
In pressing this argument, Garcia acknowledges that there is another provision of IIRIRA that could be read to take away what § 1158(a)(1) otherwise appears to give: § 1231(a)(5). That provision expressly bars aliens subject to reinstated orders of removal from seeking “any relief’ available under chapter 12 of Title 8 of the U.S. *36 Code, and Garcia does not dispute that asylum is a type of relief that is available under that chapter. 8 U.S.C. § 1231(a)(5). Nevertheless, Garcia argues that § 1158(a)(1) unambiguously creates an exception to the bar that § 1231(a)(5) otherwise appears to impose.[7]
In making this argument, Garcia cannot—and does not—contend that § 1158(a)(1) actually repealed the bar that § 1231(a)(5) appears to establish. Both provisions were enacted on the same day as part of the same statute: IIRIRA. Garcia instead argues that, in enacting IIRI-RA, Congress changed what had been the relevant text of § 1158(a)(1). And Garcia argues that Congress did so in a manner that clearly reflected an intention to carve out an exception to § 1231(a)(5) for aliens seeking asylum.
Garcia points out that, pre-IIRIRA, § 1158(a)(1) referred only to “an” alien being entitled to seek asylum “irrespective of [the alien’s] status.” Refugee Act of 1980, Pub. L. 96-212, § 208, 94 Stat. 102, 105 (emphasis added). But, Garcia notes, IIRIRA changed the wording of the text. Section 1158(a)(1) now refers to “any alien,” while keeping the sweeping phrase “irrespective of [the alien’s] status.” IIRI-RA § 604 (emphasis added). Garcia contends that this change from “an” to “any” clearly shows that Congress intended the broad grant of the right to seek asylum set forth in § 1158(a)(1) to take precedence over § 1231(a)(5)’s seemingly contradictory bar.[8]
We do not agree. As a matter of grammar, the word “any” is not clearly more sweeping than is the word “an.” Thus, the change in wording need not be understood to reflect Congress’s intention that § 1158(a)(1) trumps the bar that § 1231(a)(5) otherwise imposes. We are also reluctant to conclude that, insofar as “any” might be thought to be somewhat more sweeping than “an,” Congress used the subtle stratagem of replacing one indefinite article with a different one to signal its unambiguous intent to make an exception to an otherwise categorical bar that Congress set forth the very same day in a different provision of the very same statute. See Barraford v. T & N Ltd., 778 F.3d 258, 266 (1st Cir. 2015) (“It has been said of statutes that one does not normally hide elephants in mouseholes.” (citing Whitman v. Am. Trucking Ass’ns, Inc., 531 *37 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001))).
In addition, Garcia’s reading of § 1158(a)(1) is not necessary to ensure that one of its words—“any”—means what it says. Even on Garcia’s favored reading, the word “any” in § 1158(a)(1) would not mean literally “any.” Section 1158(a)(2) itself makes clear that certain types of aliens are not eligible to apply for asylum, even though § 1158(a)(1) states that “any” alien may do so. See 8 U.S.C. § 1158(a)(2).[9]
Garcia does argue that § 1158(a)(1) should be read to override all exceptions to its grant of the right to seek asylum except for the ones that are expressly set forth in § 1158 itself. But, even if Garcia’s suggested reading is a possible one, we do not see why it is compelled. As the Fifth Circuit observed in considering and rejecting this very same argument, Congress has “many options in revising statutory schemes,” and “[ajdopting a clear limitation in one section [i.e., § 1281(a)(5)] without amending another section specifically dealing with the same subject [i.e., § 1158] is one such option.” Ramirez-Mejia v. Lynch, 794 F.3d 485, 490 (5th Cir. 2015), reh’g en banc denied, 813 F.3d 240 (5th Cir. 2016); see also Perez-Guzman v. Lynch, 835 F.3d 1066, 1076 (9th Cir. 2016), reh’g and reh’g en banc denied (No. 13-70579, Apr. 26, 2017) (“In adopting both changes simultaneously, Congress effectively adopted ‘a clear limitation in one section’— § 1231(a)(5)—‘without amending another section’ dealing with the same subject matter.” (quoting Ramirez-Mejia, 794 F.3d at 490)).
Moreover, reading § 1231(a)(5) to set forth an additional “statutory limit,” Ramirez-Mejia, 794 F.3d at 490, does not render superfluous § 1158(a)(2), which conditions asylum eligibility on compliance with certain requirements, see 8 U.S.C. § 1158(a)(2). In addition, the limits on asylum eligibility that § 1158(a)(2) expressly sets forth do not render § 1231(a)(5) redundant if it, too, limits an alien’s right to seek asylum. Those express limits in § 1158(a)(2) do not concern the eligibility to seek relief of aliens subject to reinstated removal orders, while § 1231(a)(5) does.
Shifting course, Garcia contends that § 1158(a)(1) must be read unambiguously to trump § 1231(a)(5), because the former provision is the more specific provision of the two. But, as the Ninth Circuit has noted, the “difficulty” is that both § 1158(a)(1) and § 1231(a)(5) are “specific in certain respects and general in others.” Perez-Guzman, 835 F.3d at 1075. It is thus just as possible, as a matter of text alone, to say that § 1231(a)(5) imposes a specific check on § 1158(a)(l)’s general grant of eligibility to apply for asylum as it is to say that § 1158(a)(1) carves out a specific exception to the general bar to relief that applies to aliené subject to reinstated removal orders. See id. at 1075-76 (noting that § 1158(a)(1) is “more specific in that it speaks narrowly to the rules governing asylum applications,” while § 1231(a)(5) “is more specific in that it speaks directly to the particular subset of individuals ... who are subject to reinstated removal orders”).
Garcia’s final textual argument relies on § 1158(a)(2)(D). That provision permits individuals who have been previously denied asylum to file a second asylum application if they can demonstrate “either the existence of changed circumstances which ma *38 terially affect ... eligibility for asylum or extraordinary circumstances relating to the delay in filing an application.” 8 U.S.C. § 1158(a)(2)(D). Garcia argues that reading § 1231(a)(5) to bar aliens subject to reinstated removal orders from applying for asylum would nullify § 1158(a)(2)(D).
But Garcia is mistaken on this point. Many aliens who are not subject to reinstated orders of removal may benefit from § 1158(a)(2)(D). As a result, § 1231(a)(5), insofar as it limits § 1158(a)(2)(D), does not thereby render that provision a nullity. See Perez-Guzman, 835 F.3d at 1082 (noting that it is not “necessarily” the ease that “any individual to whom § 1158(a)(2)(D) applies will ... be subject to a reinstated removal order”).
In light of this complex statutory scheme, we cannot say that § 1158(a)(1) unambiguously grants Garcia the right to seek asylum, and we reject his contention that he wins at Chevron’s first step.
B.
Because the relevant statutory provisions do not clearly compel Garcia’s reading, we ordinarily would move on from Chevron’s first step to see whether Garcia could win at step two of the Chevron analysis. The government argues, however, that we may not do so because the relevant provisions in IIRIRA, properly read, clearly bar aliens subject to reinstated orders of removal from seeking asylum. The government thus argues not only that Garcia loses at step one of Chevron but also that the government prevails at that same step.
In so arguing, the government contends that “asylum” is plainly a form of “relief’ to which § 1231(a)(5)’s bar applies. The government further contends there is no conflict between §§ 1231(a)(5) and 1158(a)(1), because the former is more specific than the latter and thus the former must take precedence. And, finally, the government argues that its reading of “relief’ to encompass asylum comports with its conclusion that § 1231(a)(5) does not bar aliens subject to reinstated orders of removal from having their removal withheld pursuant to § 1231(b)(3)(A). And that is because, the government contends, ydth-holding of removal differs from asylum because withholding of removal provides “protection” rather than “relief.” Accordingly, the government contends that the statutes clearly compel the interpretation reflected in the regulations, in which aliens subject to reinstated orders of removal may not apply for asylum but may be entitled to withholding of removal.
A number of circuits have agreed with the government. They have held that § 1231(a)(5) does clearly bar aliens subject to reinstated orders of removal from seeking asylum, notwithstanding § 1158(a)(1). See Jimenez-Morales v. U.S. Att’y Gen., 821 F.3d 1307, 1310 (11th Cir. 2016); Ramirez-Mejia, 794 F.3d at 489-90. But, there is at the least a surface tension between the two provisions—with § 1231(a)(5) seemingly barring aliens subject to reinstated orders of removal from seeking asylum and § 1158(a)(1) seemingly conferring upon any alien (save for those expressly mentioned in that provision) the right to seek asylum. And, as the Ninth Circuit has noted, insofar as these provisions conflict, with one another, it is by no means clear which is the more specific of the two. See Perez-Guzman, 835 F.3d at 1075-76.
Thus, rather than deciding the case for the government at step one of Chevron—an issue on which we take no view— we proceed to Chevron’s second step.[10] At *39 step two, we must accept the agency’s regulatory choice as to how to resolve an ambiguity in a statute that the agency administers—such as the putative ambiguity presented by the tension we have identified—if the choice it makes is a reasonable one. See Nat’l Ass’n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 661, 666-67, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (applying Chevron deference to “mediate a clash of seemingly categorical—and, at first glance, irreconcilable—legislative commands”). And we conclude that the agency’s choice in this case is one that we must accept, because the agency’s regulations reasonably balance the various statutory provisions by “establishing] a new screening process to rapidly identify and assess both claims for withholding of removal under [§ 1231(b)(3)] and for protection under the [CAT] ... without unduly disrupting the streamlined removal processes applicable to” aliens subject to reinstated removal orders. Regulations Concerning the Convention Against Torture, 64 Fed. Reg, at 8479.
In reaching this conclusion, we recognize, as Garcia correctly points out, that courts, the BIA, and DHS have at times used the word “relief’—which is the key word in § 1231(a)(5)—to refer to both asylum and withholding of removal.[11] We thus understand the basis for Garcia’s contention that the agency’s regulatory choice is arbitrary because it permits aliens to obtain one type of “relief’ under chapter 12—withholding of removal—but not another—asylum—even though the relevant statutory provision, § 1231(a)(5), bars aliens subject to reinstated orders of removal from seeking the “relief’ chapter 12 affords. Garcia therefore argues that the only coherent interpretation is one in which the agency affords withholding of removal the same treatment as asylum. And since the agency permits aliens subject to reinstated orders of removal to be eligible for the former, Garcia contends that such aliens must be permitted to apply for latter, too.
The problem with Garcia’s argument is that the relevant question at Chevron’s second step is not whether it is possible to characterize both asylum and withholding of removal as forms of “relief,” such that each then would be subject to § 1231(a)(5)’s statutory bar or neither would be. The relevant question instead is whether it is unreasonable to distinguish between asylum and withholding of remov *40 al for purposes of applying that bar. And, in our view, it is not. See Perez-Guzman, 835 F.3d at 1081 (holding that “it is not unreasonable to conclude Congress intended to bar ... persons in reinstated removal proceedings [from applying for asylum] while preserving relief [that is, withholding of removal] for individuals able to meet the higher standards for withholding of removal and CAT, relief’).
For one thing, the distinction that the government posits in defending the regulations, such that asylum is a form of “relief’ that § 1231(a)(5) bars while withholding of removal is a form of “protection” that § 1231(a)(5) does not by its terms reach, reasonably tracks the distinct ways in which the Supreme Court has described asylum and withholding of removal in construing the United States’ obligations under the Refugee Protocol. As we noted at the outset, the Court has explained that, under the Refugee Protocol, “those who can show a clear probability of persecution are entitled to mandatory suspension of deportation ... while those who can only show a well-founded fear of persecution are not entitled to anything, but are eligible for the discretionary relief of asylum.” Cardoza-Fonseca, 480 U.S. at 444, 107 S.Ct. 1207 (emphases in original). Thus, withholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood.
The text of the relevant provisions of IIRIRA provides further support for distinguishing between asylum and withhold: ing of removal in construing the scope of the bar that § 1231(a)(5) imposes. For example, § 1231(b)(3)(A), unlike § 1158(a)(1), does not by its terms expressly purport to permit an alien to do what § 1231(a)(5) appears expressly to forbid: “apply for ... relief’ under chapter 12. Rather, § 1231(b)(3)(A) is styled as a limitation on the Attorney General’s removal authority. That provision, unlike § 1158, thus appears simply to guarantee' that an alien facing persecution or torture will receive protection from being returned to the alien’s home country.[12]
The agency’s choice to treat asylum, but not withholding of removal, as subject to the bar to applying for “relief’ set forth in § 1231(a)(5) also comports with the relevant legislative history, even if it is not compelled by it. By reading “relief’ to encompass asylum, the agency’s regulations give effect to Congress’s clear intention, in enacting § 1231(a)(5), to “strengthen the reinstatement provision and to make it operate more efficiently.” Lattab v. Ashcroft, 384 F.3d 8, 19 (1st Cir. 2004). IIRIRA did so by “enlarging] the class of illegal reentrants whose orders may be reinstated and limiting] the possible relief from a removal order available to them.” Fernandez-Vargas v. Gonzales, 548 U.S. 30, 33, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). But, the legislative history does not show that Congress intended for § 1231(a)(5) to be an all-encompassing bar on the ability of aliens subject to reinstated removal orders to remain in the United States. See S. Rep. 104-249, at 7 (1996) (emphasizing that, although “[a]liens who violate U.S. immigration law should be removed from this country as soon as possible,” that broad aim was subject to “[e]x-ceptions ... specified in the statute and approved by the Attorney General”); H.R. *41 Rep. 104-469, pt. 1, at 107-08 (1996) (noting that although “[r]emoval of aliens who enter the United States illegally ... is an all-too-rare event,” and therefore that “[r]elief from deportation will be more strictly limited,” aliens subject to the new “streamlined appeal and removal process” now laid out in § 1231(a)(5) could nevertheless “establish ... that they are entitled to be admitted or to remain in the United States”). Thus, we cannot say that the agency acted unreasonably in choosing to ensure that the same aliens who could not seek asylum still would be protected through withholding of removal from suffering persecution or torture in their home country, in accord with § 1231(b)(3)(A)’s clear directive to the Attorney General to afford that vital and long-understood-to-be mandatory protection.
III.
Garcia makes two additional arguments as to why he should win, each of which relies on a longstanding canon of construction. But, in our view, neither argument is persuasive.
First, Garcia argues that the rule of lenity that has been applied in the immigration context requires us to resolve any statutory ambiguity in his favor, notwithstanding that the agency’s choice might otherwise be considered to be a reasonable one. It is not at all clear, however, that the rule of lenity, which “favors construction of immigration laws in the light most favorable to the alien” only insofar as that alien risks the “drastic consequences of deportation,” Lumataw v. Holder, 582 F.3d 78, 90 (1st Cir. 2009), bears on the precise interpretive question that we face. After all, that question concerns the type of “relief’ that an alien whose removal has been withheld may obtain. See also Cardoza-Fonseca, 480 U.S. at 449, 107 S.Ct. 1207 (identifying a “longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien”); INS v. St. Cyr, 533 U.S. 289, 320, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (same) (quoting Cardoza-Fonseca, 480 U.S. at 421, 107 S.Ct. 1207); Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948) (applying the rule of lenity “because deportation is a drastic measure and at times the equivalent of banishment o[r] exile”).
But, even if the rule of lenity might be relevant to this case, we have stated that it “cannot apply to contravene the BIA’s reasonable interpretation” of an immigration statute where the agency makes use of “ordinary principles of statutory interpretation.” Soto-Hernandez v. Holder, 729 F.3d 1, 6 (1st Cir. 2013). And Garcia does not explain why, notwithstanding our ruling in Soto-Hernandez and the seeming reasonableness of the agency’s choice under traditional tools of statutory construction, the rule of lenity should control here.
Second, Garcia argues that, for over two hundred years, it has been a canon of statutory construction—known as the Charming Betsy canon—that a statute “ought never to be construed to violate the law of nations if any other possible construction remains.” Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). Yet, Garcia contends, the agency’s interpretation of the statutory scheme—by denying aliens subject to reinstated orders of removal the right to seek asylum—would violate certain of the United States’ obligations under the Refugee Convention, to which the United States acceded via the Refugee Protocol.
In particular, Garcia contends that the agency’s reading conflicts with Article 34 and Article 28 of the Refugee Convention. Accordingly, Garcia argues that, insofar as there is an ambiguity as to whether § 1158(a)(1) does carve out an exception to *42 § 1231(a)(5), that ambiguity must be resolved in a manner that avoids the conflicts with the Refugee Protocol that he alleges would result if § 1158(a)(1) were not construed to create such an exception.
In response, the government contends only that the Refugee Protocol is not self-executing and thus that the Charming Betsy canon does not apply. But we do not find that argument persuasive. Garcia does not seek to enforce rights arising under the Refugee Protocol and, by extension, the Refugee Convention. Rather, he contends that, under the Charming Betsy canon, the existence of these rights must be used as a guide to construing the statutory provisions at issue so as to give effect to Congress’s intent to honor the United States’ obligations under international law. As a result, we do not see why the non-self-executing status of the Refugee Protocol bears on the Charming Betsy canon’s potential application. Cf. Stevic, 467 U.S. at 425-26, 104 S.Ct. 2489 (looking to the Refugee Protocol to interpret the statutory definition of the term “refugee” and noting that Congress “intended that the definition would be construed consistently with the Protocol”); Cardoza-Fonseca, 480 U.S. at 432-33,107 S.Ct. 1207 (same).
Nevertheless, Garcia fails to show that the regulations create the kind of conflict with international law that the canon instructs us to avoid if possible. Accordingly, we do not see how the Charming Betsy canon helps him.
We start with Garcia’s reliance on the conflict that he contends would arise in consequence of Article 34, which, as we have seen, provides that “[t]he Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees.” 19 U.S.T. at 6276 (emphasis added). Garcia makes no argument, however, to support Ms contention that this “precato-ry” language, Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207, precludes a contracting State from imposing a limitation on the eligibility of an alien to seek asylum such as the limited one that the agency has concluded § 1231(a)(5) imposes. Thus, Garcia fails to show how Article 34 requires that we apply the Charming Betsy canon to read the relevant provisions to exclude “asylum” from § 1231(a)(5)’s bar.
We now turn to Article 28, which provides that “[t]he Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require.” 19 U.S.T. at 6274 (emphasis added). Garcia points out that aliens granted asylum may obtain a travel document permitting them to travel internationally. By contrast, aliens granted withholding of removal may not. Garcia thus contends that, so long as § 1231(a)(5) is read to bar aliens subject to reinstated orders of removal from seeking asylum, a conflict with the Refugee Protocol arises. And, accordingly, he contends, that the Charming Betsy canon must be deployed to avoid that conflict.
But, even though there is no dispute in this case that Garcia qualifies as a “refugee” under 8 U.S.C. § 1101(a)(42)(A), and correspondingly, under the Refugee Convention, see Cardoza-Fonseca, 480 U.S. at 436-37, 107 S.Ct. 1207, the fact is that Article 28 recognizes that exceptions may be made from its requirements for “compelling reasons of national security or public order.” The governmental interest advanced by the government’s reading of § 1231(a)(5)—deterring repeated unlawful entry into this country—would appear to constitute such a “compelling reason[ ] of ... public order.” And, Garcia makes no argument to the contrary. Thus, we have no basis for concluding that Article 28 *43 necessitates the use of the Charming Betsy canon.[13]
IV.
For the foregoing reasons, the petitions are denied.

. 8 U.S.C. § 1231(b)(3)(B) then describes certain specific categories of aliens—not including those subject to reinstated removal orders—who may not benefit from withholding of removal. See 8 U.S.C. § 1231(b)(3)(B).

. A refugee is defined in Article 1(2) of the Refugee Convention as someone who, "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country.” 19 U.S.T. at 6226.

. Aliens whose removal has been withheld are, however, like aliens granted asylum, authorized to accept employment in the United States. 8 C.F.R. § 274a. 12(a)(5), (10).

. Despite the transfer to DHS, the statutory responsibilities assigned to the Attorney General that are “indigenous to the functions of the Attorney General” were retained in the .Department of Justice. 68 Fed. Reg. at 9824.

. 8 C.F.R. § 208.16 governs the agency’s consideration of the alien’s application for withholding of removal, whether made under 8 U.S.C. § 1231(b)(3)(A) or under the CAT. See 8 C.F.R. § 208.16(b), (c); § 1208.16(b), (c).

. The dissent spends a great deal of time developing arguments about a potential due process violation concerning Garcia’s initial removal and its bearing on the propriety of his reinstated order of removal. But Garcia is arguing to us only that aliens who are subject to reinstated orders of removal may seek asylum, even though they may be barred from seeking other forms of relief. Thus, the dissent's extended discussion of case law concerning whether flaws in an underlying removal order may provide a basis for challenging a reinstated order of removal has no bearing on this appeal. That is no doubt why the due process issue on which the dissent focuses is not only not “front and center” in-Garcia’s briefing, post at 50, but also not set forth as a developed argument at all about the only statutory issue that Garcia raises— namely, how to construe § 1231(a)(5) in light of § 1158(a)(1).

. Garcia's argument regarding § 1158(a)(1), if accepted, would not render § 1231(a)(5) a nullity. Chapter 12 provides for other forms of relief, besides asylum: cancellation of removal, pursuant to 8 U.S.C. § 1229b; voluntary departure as an alternative to removal, pursuant to 8 U.S.C. § 1229c; and adjustment of status, pursuant to 8 U.S.C. § 1255. See, e.g., Fernandez-Vargas v. Gonzales, 548 U.S. 30, 42 n.9, 44 n.10, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006) (characterizing these procedural avenues as forms of "relief”); Rodriguez v. Gonzales, 451 F.3d 60, 61 (2d Cir. 2006) (characterizing cancellation of removal and adjustment of status as "relief”); see also Zambrano-Reyes v. Holder, 725 F.3d 744, 752 (7th Cir. 2013) (characterizing a motion to reopen removal proceedings as a form of relief).

. Adding force to Garcia’s argument, these other forms of relief are styled as grants of discretion to the Attorney General to provide relief, rather than as a categorical grant of an entitlement to any alien to seek it, as § 1158(a)(1) is styled. Section 1229b(a), for instance, provides: "The Attorney General may cancel removal” under certain circumstances. (emphasis added). Likewise, § 1229c provides: "The Attorney General may permit an alien voluntarily to depart the United States at the alien’s own expense....” (emphasis added). Finally, § 1255 provides: "The status of an alien who was inspected and admitted or paroled into the United States ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence....” (emphasis added).

. Garcia does not argue that the phrase “irrespective of such alien’s status”—which, unlike the change from "an” to "any,” dates back to section 208 of the Refugee Act, Cardoza-Fonseca, 480 U.S. at 427, 107 S.Ct. 1207, and thus pre-dates IIRIRA—in and of itself trumps § 1231(a)(5).

. Garcia contends that, in this case, the agency cannot benefit from deference at *39 Chevron's second step because the agency did not interpret the statutory scheme,, but instead "believe[d] that [its] interpretation is compelled by Congress.” Garcia offers no support for this proposition, and we find none' in the agency's own statements. See Perez-Guzman, 835 F.3d at 1079 n.8 ("The administrative history does not ... suggest the agency saw § 1231(a)(5) as compelling the regulation's particular approach to asylum, withholding of removal or CAT protection. On the contrary, the agency's explanation shows it applied its expertise by crafting an expedited screening process and balancing the fair resolution of claims for relief from removal against Congress’ desire to provide for streamlined removal of certain classes of individuals, including those subject to reinstated removal orders.”).

. See, e.g., Aguirre-Aguirre, 526 U.S. at 419, 119 S.Ct. 1439 ("Under the immigration laws, withholding is distinct from asylum, although the two forms of relief serve similar purposes.”); Hinds v. Lynch, 790 F.3d 259, 261 (1st Cir. 2015) (commenting that the petitioner sought no “asylum, withholding, or other relief from the Immigration Judge”); López-Castro v. Holder, 577 F.3d 49, 52 (1st Cir. 2009) ("This brings us to the particular relief sought in the instant case: withholding of removal.”); Matter of L-A-C-, 26 I. & N. Dec. 516, 519 (BIA 2015) ("[A]n applicant who seeks asylum or withholding of removal has the burden of demonstrating eligibility for such relief....”).

. In this respect, moreover, § 1231(b)(3)(A) differs significantly from each of the grants of relief other than asylum that Congress provided for in chapter 12. While Section 1231(b)(3)(A) prohibits the Attorney General from removing an alien if that alien satisfies the statutory criteria, as we noted above, §§■ 1229b, 1229c, and 1255 permit the Attorney General to undertake certain actions as a matter of discretion.

. The dissent relies on a number of provisions of the Refugee Convention that Garcia never mentions. As for the two provisions of the Convention that Garcia does address, the dissent does not address the fact that Garcia makes no developed argument regarding the exceptions they contain. Thus, the dissent does not address the fact that Garcia offers no argument as to why the government’s evident interest in deterring unlawful entry must be understood to conflict with Article 28, notwithstanding its "public order” exception, or Article 34, notwithstanding its "as far as possible” limitation. Moreover, in following our usual rules of waiver and, accordingly, holding Garcia to the arguments that he actually does develop, see Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010) (“[A]ppellate arguments advanced in a perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived.”), we do not impermissibly relieve the government of any burden of explanation that the Charming Betsy canon may impose. We simply ensure that we do not decide the case based on arguments about the meaning of international law that were never subjected to adversary testing.