# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 21, 2015

Lyle W. Cayce
Clerk

No. 14-60546

FANY JACKELINE RAMIREZ-MEJIA, also known as Fany Ramirez, also known as Fany Ramirez de Quinteros,

Petitioner

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals

Before WIENER, SOUTHWICK, and GRAVES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Fany Jackeline Ramirez-Mejia's removal order was reinstated following her illegal reentry into the United States. The Board of Immigration Appeals ruled she may not apply for asylum and is ineligible for withholding of removal or protection under the Convention Against Torture. We agree and DENY the petition for review.

In March 2006, Ramirez-Mejia, a native and citizen of Honduras, was apprehended while illegally entering the United States. She was subsequently removed from the country. She returned to the United States the next month.

No. 14-60546

In January 2012, Ramirez-Mejia was arrested for theft. Her removal order was reinstated the following day. When questioned by an immigration officer, she expressed a fear of returning to Honduras. In an interview with an asylum officer, she explained that she feared she would be killed by the same individuals who killed her brother. Based on this testimony, the asylum officer referred her case to an immigration judge ("IJ") for a hearing. At the hearing, Ramirez-Mejia testified that her brother had been murdered in May 2003. She asserted that her family attempted to file a police report, but that the police told them to "leave things the way they are . . . ." She also alleged that, in November 2005, she began receiving anonymous notes demanding that she disclose information her brother had supposedly revealed to her. Ramirez-Mejia claimed that her failure to respond led the individuals responsible for the murder to open fire on her father's business while she was present in February 2006. The police subsequently captured one of the assailants. While in custody, the assailant allegedly threatened Ramirez-Mejia and questioned her about her brother when she went to the police station to file a report.

Ramirez-Mejia maintained that she fled Honduras in response to these events. She also asserted that the individuals sought extortion money from her father after her departure and renewed their anonymous threats when she returned to Honduras in March 2006 following her removal from the United States.

The IJ noted that Ramirez-Mejia's testimony did not "seem plausible" but accepted it as credible. Nevertheless, the IJ concluded that Ramirez-Mejia was ineligible for withholding of removal or protection under the Convention Against Torture ("CAT"). The IJ noted that she had not demonstrated persecution based on membership in a protected group and rejected her argument that her nuclear family constituted a protected group. The IJ also

2

concluded that Ramirez-Mejia failed to show that the Honduran government would allow her to be tortured. In January 2013, the Board of Immigration Appeals ("BIA") dismissed Ramirez-Mejia's appeal. In February, she was removed to Honduras.

In March, Ramirez-Mejia moved to reopen her case based on the discovery of previously unavailable evidence. This evidence included: (1) an affidavit in which the wife of her brother stated that he had been a gang member and was killed by a rival gang, and that she had received threatening notes following his murder; (2) her brother's death certificate; (3) affidavits in which her parents described their extortion at the hands of the gang; (4) a criminal complaint from February 2006 describing the robbery of her father's business and subsequent capture of one of the perpetrators (no mention of gunfire is made); (5) a psychological report for Ramirez-Mejia; (6) a declaration from an expert on Central American gangs; (7) a statement in which a witness to the 2006 robbery stated that the perpetrator captured by police threatened to kill Ramirez-Mejia; (8) articles about gang violence in Honduras; (9) anonymous threatening notes; and (10) a notarized statement in which Ramirez-Mejia asserted that the Honduran public ministry advised her to return to the United States after she filed a complaint about the notes.

In May, the BIA granted the motion to reopen and remanded the case so that an IJ could determine Ramirez-Mejia's eligibility for withholding of removal and CAT protection in light of the new evidence. In June, Ramirez-Mejia applied for parole so that she could be present for the presentation of her case. The Department of Homeland Security ("DHS") granted the request, and Ramirez-Mejia was paroled into the United States in December 2013.

In February 2014, Ramirez-Mejia presented her case. She testified about her brother's murder, the incident at her father's business, and the

threats.  Additionally, an expert on Central American gangs testified about gang violence in Honduras and the government's inability to control their actions.  He stated that Ramirez-Mejia would face a high risk of harm or death upon returning to the country.  Finally, Ramirez-Mejia's husband testified that when he visited her in Honduras after her most recent removal they rarely ventured outside due to fear.

The IJ denied withholding of removal and CAT protection.  The IJ assumed the credibility of Ramirez-Mejia and her witnesses, but held that her family did not constitute a protected group, and that she had not been targeted on the basis of her familial status.  The IJ also held that Ramirez-Mejia had not demonstrated that she would be tortured by the gang with the government's acquiescence.  Finally, the IJ declined to consider Ramirez-Mejia's eligibility for asylum because her removal order had been reinstated. *See* 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8(a).

The BIA dismissed Ramirez-Mejia's appeal.  She timely filed a petition for review with this court.

## DISCUSSION

This court has jurisdiction to review the lawfulness of a reinstatement order but not the underlying removal order.  *See Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 295 (5th Cir. 2002).  We consider the BIA's order and any findings or conclusions it adopted from the IJ.  *Hakim v. Holder*, 628 F.3d 151, 153 (5th Cir. 2010).  We review questions of law *de novo* and findings of fact for substantial evidence.  *Id.*  Under the substantial-evidence standard, reversal requires the applicant to demonstrate "that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion." *Chen v. Gonzalez*, 470 F.3d 1131, 1134 (5th Cir. 2006).

4

No. 14-60546

Ramirez-Mejia claims that she is eligible for asylum, and that the BIA erred by ruling that she could not apply for asylum due to the reinstatement of her removal order. Alternatively, she claims that her parole into the country following the reopening of her case rendered the reinstatement statute inapplicable to her. She also argues that she is eligible for withholding of removal and CAT protection.

## I.     *Effects of Ramirez-Mejia's Reinstatement Order*

An alien who illegally reenters the country after removal "is not eligible and may not apply for any relief under this chapter" and "shall be removed under the prior order at any time after the reentry." 8 U.S.C. § 1231(a)(5). The alien is not entitled to a hearing prior to reinstatement but may make a statement before an immigration officer. 8 C.F.R. §§ 241.8(a), (b). If the alien expresses a fear of persecution or torture upon return to the country of removal, the alien is referred to an asylum officer. § 241.8(e). The involvement of asylum officers is not because of eligibility for asylum but for another purpose, *i.e.*, consideration for "withholding of removal only" once an asylum officer determines that the fear is reasonable. *Id.*; § 208.31(e).

Ramirez-Mejia argues that the BIA erred by concluding that Section 1231(a)(5) and its accompanying regulations precluded her from applying for asylum following the reinstatement of her removal order because asylum is not a form of "relief" under the statute. Thus, since she is physically present in the United States and none of the limiting exceptions or conditions governing asylum apply to her, she maintains that she must be allowed to apply for asylum. *See* 8 U.S.C. §§ 1158(a), (b)(2).

The immigration statutes do not define the word "relief." Nevertheless, "its familiar meaning encompasses any 'redress or benefit' provided by a court."

5

*United States v. Denedo*, 556 U.S. 904, 909 (2009) (quoting BLACK'S LAW DICTIONARY 1317 (8th ed. 2004)).  Asylum is a form of redress from removal because, if granted, it prevents the removal from going forward.  Courts routinely refer to asylum as a form of relief from removal and frequently employ the phrase "asylum relief."  *See, e.g.*, *Jama v. ICE*, 543 U.S. 335, 337 (2005); *Wang v. Holder*, 569 F.3d 531, 540 (5th Cir. 2009); *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 491 (9th Cir. 2007).  On the other hand, we agree with the government's statement at oral argument that withholding of removal and application of the CAT are often referred to as forms of protection, not relief.  *See, e.g.*, *Wang*, 569 F.3d at 535.

Under Section 1231(a)(5), an alien whose removal order is reinstated is ineligible "for *any* relief under this chapter . . . ."  8 U.S.C. § 1231(a)(5) (emphasis added).  "Read naturally, the word 'any' has an expansive meaning . . . ."  *United States v. Gonzales*, 520 U.S. 1, 5 (1997).  When the word is not qualified by restrictive language, "there is no basis in the text for limiting" the word or clause it modifies.  *Id.*  Thus, Section 1231(a)(5), read plainly, broadly denies all forms of redress from removal, including asylum.  This conclusion is confirmed by the statute's admonition that an alien who illegally reenters the country "shall be removed under the prior order at any time after the reentry."  8 U.S.C. § 1231(a)(5).  Affording asylum relief to aliens whose removal orders are reinstated would be inconsistent with this provision.  Additionally, the statute's accompanying regulations, which reiterate its blanket denial of relief and recognize an exception for withholding of removal but not asylum, also support this conclusion.  *See* 8 C.F.R. §§ 241.8(a), (e); *see also* § 208.31(e).

Ramirez-Mejia argues that this interpretation of Section 1231(a)(5) conflicts with Section 1158, which outlines the general requirements and procedures for asylum relief.  According to her, Congress intended Section

1158's criteria and conditions to be the only limitations on asylum. We disagree. Section 1158 does not "create any substantive or procedural right or benefit," and "[t]he Attorney General may provide by regulation for any . . . conditions or limitations on the consideration of an application for asylum . . . ." 8 U.S.C. §§ 1158(d)(5)(B), (d)(7). The Supreme Court emphasized the discretionary nature of asylum relief when it stated that the Attorney General is not required to grant an alien asylum even when the eligibility criteria are met. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 441, 444-45 (1987). These interpretations of Section 1158 show that it was intended to be amenable to limitation by regulation and by the exercise of discretion.

In addition, Section 1231(a)(5) imposes a statutory limit. It was designed to "enlarge[] the class of illegal reentrants whose orders may be reinstated and limit[] the possible relief from a removal order available to them." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 33 (2006). Congress has many options in revising statutory schemes. Adopting a clear limitation in one section without amending another section specifically dealing with the same subject is one such option. The judiciary's role is not to question the method of an amendment but only to interpret its effect. The clear language in Section 1231(a)(5) suffices to bar all relief from removal, even asylum.

This analysis is consistent with existing case law. At least one circuit has recognized that "'aliens subject to reinstatement of a previous removal order under [Section 1231(a)(5)]' are 'ineligible for asylum.'" *See Herrera-Molina v. Holder*, 597 F.3d 128, 139 (2d Cir. 2010) (quoting Regulations Concerning the Conventions Against Torture, 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999)). Neither the Supreme Court nor this court has explicitly addressed the issue, but both have held that aliens subject to reinstatement orders are ineligible for adjustments of status under Section 1231(a)(5). *See Fernandez-*

No. 14-60546

*Vargas*, 548 U.S. at 46-47; *Silva Rosa v. Gonzales*, 490 F.3d 403, 410 (5th Cir. 2007). Those cases provide a useful analogy. Like Section 1158, the adjustment-of-status provisions do not mention reinstatement orders. *See* 8 U.S.C. § 1255. Moreover, like asylum, adjustments of status are not specifically listed as a type of relief under Section 1231(a)(5). Nevertheless, the Supreme Court and this court both held that aliens were not eligible for an adjustment of status under Section 1231(a)(5). *See Fernandez-Vargas*, 548 U.S. at 46-47; *Silva Rosa*, 490 F.3d at 410.

In summary, Section 1231(a)(5)'s plain language, relevant regulations, and analogous case law all compel the conclusion that aliens whose removal orders are reinstated may not apply for asylum. Accordingly, the BIA did not err by declining to consider Ramirez-Mejia's eligibility for asylum relief.

## II.     *Ramirez-Mejia's Parole Into the United States*

Ramirez-Mejia also argues that Section 1231(a)(5) is inapplicable to her because it only applies to aliens who reentered the United States illegally. She last entered the country under a grant of parole pursuant to 8 U.S.C. § 1182(d)(5). Thus, she argues that the government, by paroling her into the United States to determine whether she was eligible for "withholding of removal only," displaced her prior illegal reentry and rendered her eligible for asylum. The argument is imaginative but errant.

The Immigration and Nationality Act gave the Attorney General authority to exercise discretion in granting parole and to place "such conditions as he may prescribe" on the parolee. *See* 8 U.S.C. § 1182(d)(5)(A). Even though that statute remains unchanged, parole authority now resides with the DHS.[1]

---

[1] It seems agreed that authority over granting parole was transferred from the Attorney General to the DHS in 2002 as a result of the Act that created the DHS; we need

No. 14-60546

Additionally, parole does not create an entitlement to remain in the United States: "when the purposes of such parole . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* Regulations provide further requirements and procedures for parole. *See* 8 C.F.R. § 212.5.

Ramirez-Mejia was granted parole for the purpose of pursuing withholding of removal and CAT protection. Though her presence in the country was with the permission of the DHS, we see no basis for concluding that her authorized presence overrode the effect of her earlier illegal entry. Nothing about the grant of temporary parole to pursue relief cancels the relevance of her earlier illegal reentry after having been removed. She thus remains subject to the provisions of Section 1231(a)(5).

We also see no relevance to the fact that, under certain circumstances, a removal order may not be reinstated after a removed alien legally reenters the country. For example, after the passage of a prescribed period of time, a prior removal order will not prevent a removed alien from applying for or obtaining admission to the country. *See* § 1182(a)(9); *In re Torres-Garcia*, 23 I. & N. Dec. 866, 871-72 (BIA 2006). Such circumstances are inapplicable in this case. Ramirez-Mejia has not been admitted to the United States following her removal, and her parole has no effect on her status under the law. *See* 8 U.S.C. § 1182(d)(5)(A); *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958).

Ramirez-Mejia's parole did not render Section 1231(a)(5) inoperative.

---

not trace the statutory route of the transfer here. *See Matter of Castillo-Padilla*, 25 I. & N. Dec. 257, 261 & n.1 (BIA 2010). One reference to the authority of the DHS Secretary is in 6 U.S.C. § 202(4), which provides that the Secretary is to establish and administer rules governing parole.

### III.    *Withholding of Removal*

Withholding of removal is required when an alien is able to "establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 C.F.R. § 1208.16(b).  If the alien shows past persecution based on membership in a relevant group, the burden shifts to the government to show that the threat of persecution no longer exists or can be mitigated through relocation within the country of removal.  § 1208.16(b)(1)(i)-(ii).  Otherwise, the alien must show that he will "more likely than not" suffer persecution.[2]  § 1208(b)(1)(iii), (2).  Unlike forms of relief from removal, such as asylum, withholding of removal (as well as CAT protection) prevents an alien from being returned to the place of danger; it does not prevent removal if some other country will accept the alien.  *See* § 1208.16(f).

The IJ concluded that Ramirez-Mejia's family did not meet the "particularity" and "social visibility" requirements of a "particular social group."  *See Orellana-Monson v. Holder*, 685 F.3d 511, 520-21 (5th Cir. 2012).  It also concluded that she did not establish that she was persecuted "on account of" her membership in her family.  The BIA affirmed based on the latter rationale and declined to address whether Ramirez-Mejia's family constituted a "particular social group."[3]  We agree with that conclusion and likewise do not address whether her family was a particular social group.

---

[2] This standard is more stringent than the "well-founded fear" standard applicable to asylum.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-32 (1987).

[3] Contrary to Ramirez-Mejia's contention, the BIA did not concede that her family constituted a particular social group.  Rather, it found as follows: "However the proposed social group may be defined, the applicant has not established that gang members targeted her to punish her for or to overcome her group membership."

Ramirez-Mejia argues that she was persecuted, at least in part, on the basis of her family membership because the gang referred to and sought information about her brother in the anonymous notes, sought extortion money from her parents, and referred to her brother in the note sent to her brother's wife. She also cites testimony in which her expert witness stated that a gang's animosity toward an individual may come to extend to the family as a whole. She concludes that "[w]ithout her relationship to her brother, the gang would not have asked her about any hypothetical 'information.'"

These arguments are unpersuasive. The primary purpose of the threats was to obtain information Ramirez-Mejia's brother had supposedly given her. Ramirez-Mejia emphasizes that the gang members mentioned her and her brother by name when issuing the threats. Referring to individuals by name indicates little, and certainly does not, in and of itself, evince intent to persecute on the basis of membership within a family. Accordingly, this evidence does not undermine the IJ's conclusion that Ramirez-Mejia's "worth to the persecutors is predicated on her knowledge of some supposed secret and not based upon the fact of her familial relationship to her brother."

Ramirez-Mejia maintains that "[a]ny request for information by the gang members was . . . inseparable from her relationship with her brother." She does not explain why that is so. Logically, there is no reason to suppose that those who persecute to obtain information also do so out of hatred for a family, or vice versa. As a result, the evidence that gang members sought information from Ramirez-Mejia about her brother, without more, does not support her claim that the gang intended to persecute her on account of her family. This is particularly true in light of the fact that other members of her family, who have remained in Honduras, have not faced persecution on the basis of their membership in the family.

Finally, the fact that the gang sought to extort Ramirez-Mejia's family is irrelevant for purposes of the persecution analysis, because this court "do[es] not recognize economic extortion as a form of persecution under immigration law . . . ." *Castillo-Enriquez v. Holder*, 690 F.3d 667, 668 (5th Cir. 2012) (citations and quotations omitted).

Because Ramirez-Mejia has not demonstrated that no reasonable factfinder could conclude that she was not persecuted on account of her family membership, *see Chen*, 470 F.3d at 1134, we agree with the BIA's conclusion that Ramirez-Mejia does not qualify for withholding of removal.

## IV.  CAT Protection

To be eligible for CAT protection, an alien must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). In assessing the likelihood of torture, the factfinder may consider evidence of past torture, the alien's ability to relocate within the country of removal to avoid torture, and human rights violations within the country of removal. § 1208.16(c)(3). "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official . . . ." § 1208.18(a)(1). Willful blindness to torture constitutes acquiescence. *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 354 (5th Cir. 2002).

The BIA accepted the IJ's finding that Ramirez-Mejia would not more likely than not be tortured by or with the consent of the Honduran government if she returned to Honduras. The IJ observed that Ramirez-Mejia, her family, and her brother's wife had not been tortured in the past; she did not show an inability to relocate to a part of Honduras where her likelihood of harm would

be diminished, as her brother's wife had done; and she did not show acquiescence to violence by the Honduran police, who in fact arrested a gang member and requested that she give a statement after the robbery of her father's business in 2006.

Ramirez-Mejia does not specifically contest these findings. Instead, she emphasizes the country reports discussing gang violence and police corruption in Honduras. She also reiterates her allegations that the police recommended against filing a report after her brother's murder and responded with indifference when she disclosed the arrested gang member's threats in 2006 and the anonymous notes in 2013. This evidence, she claims, shows that it is more probable than not that she will be tortured if removed to Honduras.

Ramirez-Mejia has not demonstrated that no reasonable factfinder could conclude that she did not qualify for CAT protection. *See Chen*, 470 F.3d at 1134. First, she has not contested the finding that she was not tortured before leaving Honduras or after returning following her first and second removal. Nor has she contested the finding that her brother's wife and family members were not tortured, despite remaining in Honduras after her brother's murder. Finally, the fact that her brother's wife has not been harmed since moving to another part of Honduras suggests that any danger of harm could be mitigated through relocation. Based on this evidence, a reasonable factfinder could have found that Ramirez-Mejia would not more likely than not be tortured if removed to Honduras. Although the country reports and alleged threats emphasized by Ramirez-Mejia may weigh against this conclusion, they do not *compel* the opposite conclusion. *See id.*

Second, Ramirez-Mejia has offered little evidence that the government would acquiesce in gang members' attempts to harm her. Although she alleged that the police told her not to report her brother's murder and "not to get

13

involved with these people," she did not allege that the police stated or otherwise indicated that they would permit harm to befall her if she did file a report.  Additionally, she asserted that the police allowed her to be threatened by a gang member after the robbery of her father's business in 2006, but she acknowledged that the police arrested the gang member and insisted that she file a report against him.  Finally, she alleged that officials advised her to leave the country when she disclosed the anonymous notes she had received.  Again, however, she did not allege that the officials expressed any intent to acquiesce in her torture if she did not leave.  This evidence, as well as the country reports and related testimony, does not compel the conclusion that the government would acquiesce in Ramirez-Mejia's torture if she returned to Honduras.

We agree with the BIA's conclusion that Ramirez-Mejia does not qualify for CAT protection.

Petition DENIED.

14