# United States Court of Appeals
# for the Fifth Circuit

No. 19-60408

United States Court of Appeals
Fifth Circuit

**FILED**
August 31, 2021

Lyle W. Cayce
Clerk

Sergio L. Tabora Gutierrez,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
No. A206-012-003

Before Davis, Duncan, and Oldham, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

This is yet another immigration case involving the vicious international gang Mara Salvatrucha ("MS-13") and its brutalization of the people of Honduras.[1] The record shows that, thanks in part to MS-13, Honduras has become "one of the most violent countries on the planet that

---

[1] *See Castro-Rodriguez v. Garland*, __ F. App'x __, 2021 WL 1232085 (5th Cir. Apr. 2, 2021) (per curiam); *Castillo-Cruz v. Barr*, 831 F. App'x 739 (5th Cir. 2020) (per curiam); *Aguilar-Chavez v. Barr*, 799 F. App'x 288 (5th Cir. 2020) (per curiam); *Bonilla Cruz v. Barr*, 777 F. App'x 119 (5th Cir. 2019) (per curiam); *Cabrera v. Sessions*, 890 F.3d 153 (5th Cir. 2018); *Paz v. Sessions*, 676 F. App'x 331 (5th Cir. 2017) (per curiam).

No. 19-60408

is not at war." In Honduras, "gang beheadings and dismemberment of victims are now routine; lynching and burning victims alive are commonplace; and the recruitment of children as young as 11 is an everyday occurrence." Although the Honduran government has tried to combat MS-13, it still "cannot guarantee a minimum level of security for all its citizens."

Petitioner Sergio Luis Tabora Gutierrez was born and raised in this crucible of violence. He has resisted MS-13's attempts to coerce him to join the gang or pay a "war tax." For that, gang members have repeatedly brutalized him and his wife and threatened to kill them. The record contains gruesome photos of his wounds. Tabora Gutierrez therefore entered the United States illegally and, as relevant here, sought relief under the Convention Against Torture (CAT). The immigration judge (IJ)—finding Tabora Gutierrez credible and his account "detailed, plausible, and coherent"—found that "MS-13 is more likely than not to torture or kill him upon his return." Nonetheless, the IJ denied CAT relief and ordered Tabora Gutierrez removed to Honduras because it found any such torture would not occur with the "consent or acquiescence" of Honduran officials. Finding no clear error in that determination, the BIA dismissed Tabora Gutierrez's appeal. He petitioned for our review.

We deny his petition. Tabora Gutierrez, ably represented by *pro bono* counsel, makes a compelling humanitarian case for why removing him to Honduras will effectively abandon him to torture and death at the hands of MS-13 thugs. Yet to make out a CAT claim, the law demands that this violence will likely occur "with the consent or acquiescence" of Honduran officials, 8 C.F.R. § 1208.18(a)(1), and the IJ and the BIA found that it would not. We can reverse that finding only if the evidence *compels* a contrary conclusion. *Iruegas-Valdez v. Yates*, 846 F.3d 806, 810 (5th Cir. 2017). It does not. We must therefore deny the petition.

No. 19-60408

During oral argument, the government—evidently troubled by Tabora Gutierrez's predicament—suggested he may be a candidate for a discretionary grant of deferred action. *See* O.A. Rec. at 44:55–45:30. The government was apparently referring to a form of prosecutorial discretion that "allows an otherwise deportable alien to remain in this country." *Deferred Action*, 1 Immigr. Law and Defense, § 8:52; *see also Reno v. American-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 484 (1999) (discussing "deferred action," under which immigration enforcement officials would "exercis[e] [their] discretion for humanitarian reasons . . . '[t]o ameliorate a harsh and unjust outcome'") (quoting 6 C. Gordon, S. Mailman, & S. Yale-Loer, Immigration Law and Procedure § 72.03[2][h] (1998)). Because federal courts lack authority to grant deferred action, we express no opinion whether it should be granted in this case.

## I.

## A.

Tabora Gutierrez is a native and citizen of Honduras. On March 14, 2018, he illegally sought entry into the United States and was subsequently ruled inadmissible by an immigration court. *See* 8 U.S.C. § 212(a)(7)(A)(i)(I). On May 24, 2018, Tabora Gutierrez submitted a *pro se* application for asylum and withholding of removal and, with counsel's assistance, an amended application on June 18, 2018. A hearing was held before an immigration judge (IJ) on September 5, 2018, at which Tabora Gutierrez testified.

Tabora Gutierrez was born November 1, 1987, in El Progreso, Honduras, and was raised in Choloma, Honduras by his aunt. The criminal gang MS-13 was active in Choloma during Tabora Gutierrez's adolescence. The gang would recruit children as tax collectors and spies, even sending them to beat, torture, and kill people. *See, e.g.*, *Cabrera v. Sessions*, 890 F.3d

153, 156 (5th Cir. 2018) ("As in much of the country, Honduras's large and powerful gangs—including MS-13 or 'the Maras' and their rivals, Barrio 18—are ubiquitous in Choloma.").

In 2006, Tabora Gutierrez traveled to the United States to meet his mother but was removed back to Honduras in 2013. While he was gone, MS-13's activities in Choloma had "multiplied": the gang controlled parts of the city and would extort a "war tax" from people by threats of torture or death. The gang had also infiltrated the school where Tabora Gutierrez and his common-law wife sent their daughter, recruiting fifth- and sixth-graders to distribute drugs.

In December 2013, gang members began trying to recruit Tabora Gutierrez. When he refused to join, they angrily threatened him. This happened again in early 2014. Tabora Gutierrez was given the choice to join or pay a war tax of $25–30 a week. He adamantly refused, and the gang members said he would be killed if he did not pay. Frightened, Tabora Gutierrez reported the threat to local police, but the officer told him he did not "have enough proof to accuse them."

Tabora Gutierrez moved his family about 30 minutes away but still felt unsafe because of MS-13's pervasive network of spies. Sure enough, gang members found him in August 2014 while he was dropping his daughter off at school and again threatened to kill him. Tabora Gutierrez began moving "from house to house out of fear." Due to these threats, he tried to enter the United States in 2016 but was returned immediately.

In September 2017, four gang members assaulted Tabora Gutierrez in a restaurant. For over twenty minutes, they beat, kicked, and stabbed him with a broken bottle, while telling him the beating was in retaliation for his not joining MS-13. Witnesses did not intervene and the police did not come. Tabora Gutierrez passed out and awoke in an emergency clinic, where a

cousin had taken him. His appellate brief contains gruesome photos of his injuries. He then relocated his family to another city, where he spent almost two months recuperating. He reported the beating to local police, but was not given a police report or any information about an investigation.

In December 2017, masked gunmen confronted Tabora Gutierrez and his wife while they were riding motorcycles. Tabora Gutierrez was shot three times in the chest or stomach, buttocks, and leg; his wife was shot twice. They survived, however, after spending six days in the hospital. (His brief also contains photos of the gunshot wounds). When they returned home, neighbors told them armed men had come looking for them. Tabora Gutierrez again moved his family elsewhere.

He reported the shooting to police in Choloma and San Pedro Sula, identifying the masked shooters as MS-13 members by the tattoos on their arms. The Choloma officers told him they "could not help [him]" and that if he "valued [his] life, [he] should flee from the country." The San Pedro Sula officers sent him to a local prosecutor's office, where he filed a statement on February 1, 2018. Tabora Gutierrez admitted he did not know who had shot him and his wife. But the woman who took his statement stated "they would get [her] at [her] house" if she wrote down who shot him. She also "didn't want to include" the shooters' gang affiliation in the report.

Finally, Tabora Gutierrez testified that, if he were returned to Honduras, MS-13 would find him again through its network of spies throughout the country. He claimed his scars from the beating and shooting would easily identify him. And given his repeated refusals to join the gang or pay the war tax, he feared he would be tortured and killed.

## B.

The IJ found Tabora Gutierrez "generally credible," noting that "he provided a detailed, plausible, and coherent account of his past experiences,"

as well as "corroborating evidence" in the form of "medical documentation, photographs, and a police report." The IJ then assessed Tabora Gutierrez's claims for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

As to asylum, the IJ ruled that Tabora Gutierrez's past persecution, while sufficiently severe, was not perpetrated on account of any protected ground. *See* 8 U.S.C. § 1158(b)(1)(B)(i) (providing "at least one central reason" for persecution must be "race, religion, nationality, membership in a particular social group, or political opinion"). Instead, his treatment resulted from "the unfortunately commonplace criminal agenda of MS-13: to recruit, extort, threaten, and retaliate against those who defy them." This conclusion also foreclosed Tabora Gutierrez's alternate claim that he had a well-founded fear of future persecution. *See, e.g.*, *Zhao v. Gonzales*, 404 F.3d 295, 307 (5th Cir. 2005) (future persecution claim must show reasonable fear of persecution on account of same protected grounds as past persecution) (citing 8 C.F.R. § 208.13(b)(2)(iii)(A)–(B) (2003)); *see also* 8 U.S.C. § 1101(a)(42)(A). Moreover, the failure of Tabora Gutierrez's asylum claim meant he could not satisfy the higher standard for withholding of removal. *Majd v. Gonzales*, 446 F.3d 590, 595 (5th Cir. 2006) (citation omitted); *see* 8 U.S.C. § 1231(b)(3)(A).

As to the CAT claim, the IJ first found that Tabora Gutierrez was likely to be tortured or killed by MS-13 upon his return to Honduras, meeting the first requirement for CAT relief. *See, e.g.*, *Iruegas-Valdez v. Yates*, 846 F.3d 806, 812 (5th Cir. 2017). But the IJ found Tabora Gutierrez failed to meet the second requirement, namely that there would be "sufficient state action involved in that torture." *Ibid.*

On this point, the IJ first rejected Tabora Gutierrez's argument that the police were "accomplices" of the gang. While noting ample evidence that

Honduran officials were "easily corruptible, inefficient, and incapable in every sense of confronting the gangs," the IJ nonetheless found that "Honduras is not willfully blind to this 'endemic corruption' and is taking meaningful steps to address these problems." For instance, the IJ referenced a 2018 presidential commission to root out police corruption that had resulted in removing thousands of officers, thus "demonstrat[ing] that Honduras does not turn a blind eye to police corruption or to the harm that [Tabora Gutierrez] fears, being killed by MS-13."

Next, the IJ rejected Tabora Gutierrez's argument that failure by the police and prosecutors to investigate the attacks on him showed that Honduran officials "would acquiesce in his torture by MS-13." *See Iruegas-Valdez*, 846 F.3d at 812 (state action may be shown where torture is inflicted "with the consent or acquiescence of a public official or other person acting in an official capacity") (citing 8 C.F.R. § 1208.18(a)(1)). The IJ found the failure to investigate did not show officials would acquiesce in his torture but instead reflected "the incomplete nature of the police report." The IJ also found that Tabora Gutierrez's "speculation" that officers would not protect him in the future from MS-13 was "insufficient to show state action." While conceding Honduras had "made little progress" in reforming its institutions and curtailing gang violence, the IJ reasoned that "[t]he lack of resources to guarantee safety, while unfortunate, is not sufficient to establish Honduras's acquiescence to the harm [Tabora Gutierrez] fears by MS-13."

Tabora Gutierrez appealed to the BIA, which declined to overturn the IJ's decision. Specifically as to the CAT claim, the BIA did not disturb the IJ's finding that Honduran officials were not likely to acquiesce in his torture by MS-13 if he were returned to Honduras. It reasoned that a CAT claim is not established merely by showing police have not apprehended the gang members who tortured him, nor even by showing officials lack the ability to protect him. *See Tamara-Gomez v. Gonzales*, 447 F.3d 343, 351 (5th Cir.

2006). It also observed that "speculation that the police might not prevent . . . violence [by nongovernmental actors] is generally insufficient to prove government acquiescence, especially if there is evidence that the government prosecutes rogue or corrupt public officials." *See Garcia v. Holder*, 756 F.3d 885, 892 (5th Cir. 2014).

The BIA also considered the IJ's findings regarding the failure of police to investigate the attacks against Tabora Gutierrez. The BIA did not see this as evidence that the officials either were complicit in or "willfully ignored" the attacks. Like the IJ, the BIA noted that Tabora Gutierrez "was unable to disclose the specific identity of any of his attackers" and so the police inaction did not show the police "bre[a]ched its duty to intervene to prevent such activity from reoccurring." As to the officer who declined to note the attackers' gang affiliation, the BIA reasoned that "the fact that a frightened police officer feared stating MS-13's identity in a police report is insufficient to establish that the Honduran authorities had sufficient evidence to take action on his complaint, but were willfully blind by failing to do so." The BIA therefore found "no clear error" in the IJ's findings that Honduran officials had not acquiesced in his torture by MS-13 or "that any Honduran public official would specifically acquiesce to the MS-13 torturing him if he returns to Honduras."

Finally, the BIA agreed with the IJ that "the background information on Honduras" did not establish that officials "would more likely than not acquiesce to his torture." While noting Honduras's "often losing battle against the gangs" and the "regrettable" facts that authorities may not be able to protect Tabora Gutierrez, the BIA "note[d], as did the [IJ], that Honduras has taken steps to battle corruption among its public officials," which "suggests that the Honduran government does not acquiesce to and is not willfully blind to gangs torturing its citizens." The BIA emphasized that it "do[es] not ignore the [IJ's] determination that [Tabora Gutierrez] has

No. 19-60408

established that it is more likely than not that the MS-13 will torture him in Honduras." Nonetheless, the BIA affirmed the IJ's finding that such torture would not be "with the consent or acquiesce[nce] (including willful blindness) of a public official or other person acting in an official capacity." The BIA therefore dismissed the appeal.

Tabora Gutierrez timely appealed to our court, limited to his CAT claim. A panel granted his emergency motion for stay of removal pending appeal.

## II.

We review the BIA's decision as final agency action. *Qorane v. Barr*, 919 F.3d 904, 909 & n.1 (5th Cir. 2019) (citing *Castillo-Rodriguez v. INS*, 929 F.2d 181, 183 (5th Cir. 1991)). Our review considers the IJ's reasoning only insofar as the BIA's decision incorporated it. *Id.* at 909 n.1 (citing *Chun v. INS*, 40 F.3d 76, 78 (5th Cir. 1994) (per curiam)). We review the BIA's legal conclusions *de novo* and its factual findings for substantial evidence. *See Pena Oseguera v. Barr*, 936 F.3d 239, 250 (5th Cir. 2019) (citation omitted). "Under substantial evidence review, we may not reverse the BIA's factual determinations unless we find not only that the evidence supports a contrary conclusion, but that the evidence *compels* it." *Iruegas-Valdez*, 846 F.3d at 810 (citing *Chun*, 40 F.3d at 78).

## III.

On appeal, Tabora Gutierrez raises two issues concerning his CAT claim.[2] First, he argues the BIA applied the wrong standard of review to the IJ's acquiescence finding. Second, he argues alternatively that the evidence

---

[2] He therefore has abandoned any grounds for contesting the denial of his asylum and withholding of removal claims. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).

No. 19-60408

compels the conclusion that Honduran officials will acquiesce in his torture. We address each issue in turn after setting out the relevant law.

**A.**

The CAT protects an alien when "it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).[3] "Torture" means "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" for specified purposes, including "intimidating or coercing him or her or a third person." *Id.* § 1208.18(a)(1). Torture includes "prolonged mental harm caused by or resulting from . . . [t]he threat of imminent death." *Id.* § 1208.18(a)(4)(iii).

Importantly, the pain or suffering must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." *Id.* § 1208.18(a)(1). To "acquiesce," the official must, "prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7). This "awareness requires a finding of either actual knowledge or willful blindness." *Ibid.* The regulation discusses "willful blindness" at length:

> Willful blindness means that the public official . . . was aware of a high probability of activity constituting torture and deliberately avoided learning the truth; it is not enough that such public official . . . was mistaken, recklessly disregarded the truth, or negligently failed to inquire.

---

[3] *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, 114.

> In order for a public official to breach his or her legal responsibility to intervene to prevent activity constituting torture, the official must have been charged with preventing the activity as part of his or her duties and have failed to intervene.
>
> No person will be deemed to have breached a legal responsibility to intervene if such person is unable to intervene, or if the person intervenes but is unable to prevent the activity that constitutes torture.

*Ibid.* (paragraph breaks added).

The applicant bears the burden of proof that it is "more likely than not" he would be tortured upon removal, but he may meet that burden through his own credible testimony even without corroboration. *Id.* § 1208.16(c)(2). In assessing the likelihood of torture, "all evidence relevant to the possibility of future torture shall be considered," including:

    (i) Evidence of past torture inflicted upon the applicant;

    (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

    (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

    (iv) Other relevant information regarding conditions in the country of removal.

*Id.* § 1208.16(c)(3)(i)–(iv).

To implement this regulatory scheme, we have set out a two-part analysis. An alien must show (1) "it more likely than not that [he] will be tortured upon return to his homeland"; and (2) "sufficient state action involved in that torture." *Iruegas-Valdez*, 846 F.3d at 812 (citing *Garcia*, 756 F.3d at 891); *see also, e.g.*, *Morales v. Sessions*, 860 F.3d 812, 818 & n.28 (5th Cir. 2017); *Tamara-Gomez*, 447 F.3d at 350–51.

**B.**

Tabora Gutierrez first argues the BIA applied the wrong standard in reviewing the IJ's finding that officials would not acquiesce in his torture. Citing out-of-circuit decisions, Tabora Gutierrez contends that this is a mixed question of law and fact and that the BIA should have reviewed the ultimate question of state acquiescence *de novo* instead of for clear error. *See Cruz-Quintanilla v. Walker*, 914 F.3d 884, 889–91 (4th Cir. 2019); *Myrie v. Att'y Gen.*, 855 F.3d 509, 516–17 (3d Cir. 2017) (both treating "acquiescence" as a legal judgment reviewed by the BIA *de novo*).

We lack jurisdiction to consider this argument. Tabora Gutierrez was required to exhaust the issue by raising it in a motion for reconsideration. *See Avelar-Oliva v. Barr*, 954 F.3d 757, 766 (5th Cir. 2020) ("Avelar-Oliva's contention that the BIA misapplied the standard of review should have been presented to the BIA in a motion for reconsideration."). At oral argument, Tabora Gutierrez's counsel conceded reconsideration was not sought on this basis. O.A. Rec. at 2:20. Counsel countered that doing so was unnecessary because his BIA brief raised the issue. We disagree. Counsel could point only to the generic "standard of review" paragraph in that brief. O.A. Rec. at 5:45, 6:45. That boilerplate did not make a "concrete statement before the BIA to which [Tabora Gutierrez] could reasonably tie his claims before this court." *Dale v. Holder*, 610 F.3d 294 (5th Cir. 2010). His standard-of-review argument is "a wholly new ground for relief arising only as a consequence of some [claimed] error in the deportation proceedings," one the BIA "never had a chance to consider." *Avelar-Oliva*, 954 F.3d at 766 (quoting *Dale*, 610

No. 19-60408

F.3d at 298–99) (brackets added). Because he failed to exhaust this argument, we cannot consider it. *See ibid.*; 8 U.S.C. § 1252(d)(1)).[4]

## C.

Alternatively, Tabora Gutierrez argues the evidence shows that officials would acquiesce in his torture if he were returned to Honduras. This argument faces a steep climb. We cannot reverse the BIA "unless we decide 'not only that the evidence supports a contrary conclusion, but also that the evidence *compels* it.'" *Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006) (quoting *Zhao*, 404 F.3d at 306); *see also* 8 U.S.C. § 1252(b)(4)(B) (agency's "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). While Tabora Gutierrez can point to some evidence supporting his argument, he fails to show the evidence as a whole compels a conclusion contrary to the BIA's.

Tabora Gutierrez contends the evidence compels finding officials were "willfully blind" to his victimization by MS-13 because they either failed to investigate, or refused to investigate, the attacks against him. *See, e.g.*, *Hakim v. Holder*, 628 F.3d 151, 155 (5th Cir. 2010) ("We have held that the requisite 'acquiescence' [under the CAT] is satisfied by a government's

---

[4] We therefore do not address whether the issue is open in our circuit. The government argues it is not, because our cases treat state acquiescence as a fact question. There is support for that view. *See, e.g.*, *Gonzalez-Veliz v. Barr*, 938 F.3d 219, 225 (5th Cir. 2019); *Morales-Morales v. Barr*, 933 F.3d 456, 464–68 (5th Cir. 2019); *Martinez Manzanares v. Barr*, 925 F.3d 222, 228–29 (5th Cir. 2019); *Ramirez-Mejia v. Lynch*, 794 F.3d 485, 493–94 (5th Cir. 2015); *Chen v. Gonzales*, 470 F.3d 1131, 1142 (5th Cir. 2006); *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 354–55 (5th Cir. 2002). But no decision of ours expressly addresses the issue, and we need not confront it. *See Cruz-Quintanilla*, 914 F.3d at 891 (along with the Fourth, the Third Circuit is "the only other court of appeals to address this question") (citing *Myrie*, 855 F.3d at 516–17). For similar reasons, we need not consider the Attorney General's recent decision in *Matter of R-A-F-*, 27 I. & N. Dec. 778, 779–81 (A.G. 2020), which adopts the Third and Fourth Circuits' view on this issue.

willful blindness of torturous activity.") (citing *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 354 (5th Cir. 2002)). The BIA and the IJ could have drawn such an inference from the evidence. *See* 8 C.F.R. § 1208.18(a)(7) (willful blindness may be shown if an official was "charged with preventing the [torturous] activity as part of his or her duties and . . . failed to intervene"). But they did not. Instead, the BIA—agreeing with the IJ—found the police inaction was better explained by the fact that Tabora Gutierrez "was unable to disclose the specific identity of any of his attackers." The BIA and the IJ thus interpreted the evidence, not to show the police "willfully ignored" the attacks or "bre[a]ched its duty" to prevent them, but rather to show the police "may not have been in possession of sufficient evidence to take further action." Because the evidence does not compel a contrary conclusion, the IJ's findings, which the BIA adopted, are "conclusive." 8 U.S.C. § 1252(b)(4)(B).

We take a similar view of evidence that local police told Tabora Gutierrez they "could not help [him]" and that he "should flee from the country." The BIA concluded this evidence showed that the officials lacked the ability to protect Tabora Gutierrez, not that they would acquiesce in his torture. The evidence does not compel Tabora Gutierrez's contrary view. Indeed, we have held that similar evidence did not compel a finding of government acquiescence in gang torture. *See Ramirez-Mejia v. Lynch*, 794 F.3d 485, 494 (5th Cir. 2015) (evidence did not compel finding acquiescence where police "advised [claimant] to leave the country" after she received gang threats); *see also, e.g.*, *Martinez Manzanares v. Barr*, 925 F.3d 222, 229 (5th Cir. 2019) ("[A] government's inability to protect its citizens does not amount to acquiescence [under the CAT].") (citing *Qorane v. Barr*, 919 F.3d 904, 911 (5th Cir. 2019)); *Tamara-Gomez*, 447 F.3d at 351 (concluding "neither the failure to apprehend the persons threatening the alien, nor the lack of financial resources to eradicate the threat or risk of torture

constitute[s] sufficient state action for [CAT] purposes"); 8 C.F.R. § 1208.18(a)(7) (official does not breach a duty to intervene "if such person is unable to intervene, or if the person intervenes but is unable to prevent the activity that constitutes torture").

Tabora Gutierrez stresses the fact that a San Pedro Sula official declined to include in her report that his assailants were gang-affiliated, expressing fear that "they would get [her] at [her] house." But the BIA and IJ declined to find this evidence showed the official would acquiesce in Tabora Gutierrez's torture. Echoing the IJ's finding, the BIA concluded "the fact that a frightened police officer feared stating MS-13's identity in a police report is insufficient to establish that the Honduran authorities had sufficient evidence to take action on his complaint, but were willfully blind by failing to do so." While the IJ and BIA could have made a different finding—namely, that the official's fear of MS-13 meant she would turn a blind eye to Tabora Gutierrez's torture—the evidence did not compel them to do so. *See, e.g.*, *Martinez-Lopez v. Barr*, 943 F.3d 766, 773 (5th Cir. 2019) (allegations of "the unwillingness of the Honduran police to investigate gang violence may weigh against the IJ's conclusion, but they do not *compel* the opposite conclusion") (cleaned up); *Ramirez-Mejia*, 794 F.3d at 494 (finding of acquiescence not compelled by evidence that "the police told [claimant] not to report her brother's [gang-related] murder and 'not to get involved with these people'"); *Ontunez-Tursios*, 303 F.3d at 354 (finding of acquiescence not compelled where evidence provided "at least some explanation" why government did not arrest third parties).

Tabora Gutierrez also suggests the evidence of police inaction raises the "specter of overt police-gang collusion." But the IJ and the BIA declined to find the evidence showed police complicity with MS-13 here. Moreover, both the IJ and the BIA properly took into account general evidence showing that, while Honduras suffers widespread police corruption, the country is

nonetheless "taking meaningful steps to address these problems." *See also* 8 C.F.R. § 1208.16(c)(3)(iv) (court shall consider "all evidence relevant to the possibility of future torture," including "[o]ther relevant information regarding conditions in the country of removal"); *Chen*, 470 F.3d at 1142 ("Consideration of government efforts to combat corruption or abuse . . . is relevant to the willful blindness inquiry.") (citing *Tamara-Gomez*, 447 F.3d at 351). The evidence does not compel the conclusion that complicit officials would acquiesce in Tabora Gutierrez's torture by MS-13.

Finally, Tabora Gutierrez argues the BIA erred by focusing only on high-level officials and ignoring lower-level officials. *See, e.g.*, *Iruegas-Valdez*, 846 F.3d at 813 (acquiescence may be shown by "the use of official authority by low-level officials, such a[s] police officers") (citing *Garcia*, 756 F.3d at 891–92). We disagree. The BIA and IJ each considered evidence of acquiescence as it related to both local and national officials. And, as discussed, the BIA and IJ both properly considered Honduras's broader efforts to root out police corruption and combat gang violence in gauging the likelihood that officials would acquiesce in Tabora Gutierrez's torture. *See* 8 C.F.R. § 1208.16(c)(3)(iv); *see also Martinez-Lopez*, 943 F.3d at 772–73 ("[A]lthough the record contains reports of some Honduran authorities working with gangs, those same reports indicate that the Honduran government is working to combat both corruption and gang violence.") (citing *Chen*, 470 F.3d at 1142).

## IV.

Anyone can see the awful situation Tabora Gutierrez is in. Like the BIA, "[w]e do not ignore the [IJ's] determination that [Tabora Gutierrez] has established that it is more likely than not that the MS-13 [gang] will torture him in Honduras." But the evidence does not compel the conclusion that this torture will occur with the consent or acquiescence of Honduran

No. 19-60408

officials. We therefore cannot disturb the BIA's decision dismissing his appeal. Nothing we say here prevents the government, as it suggested at oral argument, from assisting Tabora Gutierrez with a discretionary grant of deferred action to prevent his removal to Honduras. *See* O.A. Rec. at 44:55–45:30.

Petition DENIED.

No. 19-60408

W. Eugene Davis, *Circuit Judge*, dissenting:

I agree with the IJ, the BIA, and the majority that Tabora Gutierrez will likely be tortured by MS-13 gang members if returned to Honduras. But, I read the record to compel a conclusion that the torture will be with the acquiescence of a public official. I disagree with the majority's conclusion to the contrary.

The governing legal principles are not in dispute, stated simply. Under the governing regulations, if a police officer or other law enforcement official has knowledge that a citizen is being assaulted and seriously injured, that official has the legal duty to intervene to prevent that activity.[1] If an official who has knowledge of such activity deliberately avoids learning the truth, such conduct is considered willful blindness and satisfies the acquiescence requirement.[2]

---

[1] *See* 8 C.F.R. § 1208.18(a)(7) ("Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity. Such awareness requires a finding of either actual knowledge or willful blindness. Willful blindness means that the public official acting in an official capacity or other person acting in an official capacity was aware of a high probability of activity constituting torture and deliberately avoided learning the truth; it is not enough that such public official acting in an official capacity or other person acting in an official capacity was mistaken, recklessly disregarded the truth, or negligently failed to inquire. In order for a public official to breach his or her legal responsibility to intervene to prevent activity constituting torture, the official must have been charged with preventing the activity as part of his or her duties and have failed to intervene. No person will be deemed to have breached a legal responsibility to intervene if such person is unable to intervene, or if the person intervenes but is unable to prevent the activity that constitutes torture.").

[2] *Hakim v. Holder*, 628 F.3d 151, 155 (5th Cir. 2012) (citing *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 354 (5th Cir. 2002)).

No. 19-60408

## A.

Tabora Gutierrez pointed to numerous incidents to demonstrate that Honduran public officials had been willfully blind to the torture he suffered—and failed to intervene—thereby satisfying the "acquiescence" prong of CAT relief. The IJ and BIA credited Tabora Gutierrez's testimony recounting several failures of the police to investigate or otherwise act on his reports of violent attacks by MS-13 gang members. He testified that the police had failed to act in 2014 after he reported being accosted and threatened by MS-13. Eventually, these encounters escalated and in September 2017, Tabora Gutierrez was severely beaten and hit with a broken glass bottle, which resulted in serious injuries and treatment at an emergency clinic. Tabora Gutierrez contended that this attack occurred because he had repeatedly refused to join MS-13, and the attackers badgered him about joining them as they beat him. Following the attack, Tabora Gutierrez said that he went to the police to press charges against the attackers, but the police did not investigate the attacks or take steps to arrest the individuals who had beaten him.

The majority points to the IJ and BIA's conclusion that the police inaction was better explained by the fact that Tabora Gutierrez "was unable to disclose the specific identity of any of his attackers." But, this explanation for the officials' failure to act makes no sense. This is a classic "blame the victim" excuse. Many if not most victims of gang attacks do not know the identity of their attackers. Petitioner told the police how he knew the attackers were MS-13 gang members. He cooperated fully with the police and told them everything he knew.

In December 2017, Tabora Gutierrez alleged that he was again attacked by men he suspected were members of MS-13 based on their tattoos. The three men shot Tabora Gutierrez and his wife; Tabora Gutierrez was hit

19

by three bullets and his wife by two bullets. Tabora Gutierrez and his wife were hospitalized for six days after the shooting, and Tabora Gutierrez reported the shooting to police departments in two different cities. The police officer in one of the cities told Tabora Gutierrez they could not help and even recommended that he flee the country; the police in the other city referred him to a prosecutor's office to take his statement. However, when he went to the prosecutor's office, the person who recorded his statement said she was concerned for her personal safety at the hands of MS-13 gang members.  She told petitioner if she filed a report of a MS-13 attack, MS-13 gang members would retaliate against her.  She then failed to include in the report that petitioner's attack was from MS-13 gang members. Tabora Gutierrez testified that the police never investigated the shooting. He asserted that when his aunt asked the police about the status of the investigation into his shooting, she was threatened by gang members, supporting his firm belief that the police never investigated and that they communicated with MS-13 members. All of this testimony was credited by the IJ and the BIA and acknowledged by the majority.

The IJ also noted that Tabora Gutierrez established that there was nowhere within Honduras he could relocate to avoid torture by MS-13. The official country reports on Honduras reveal the corruption and inefficiency of the Honduran government and police, which the IJ summarized in his factual findings and the BIA acknowledged in its opinion. These materials show that MS-13 commits killings, extortion, kidnappings, and human trafficking, and intimidates the police, prosecutors, journalists, women, and human rights defenders.

Moreover, the IJ recognized that the record showed that the Honduran government and police are "easily corruptible, inefficient, and incapable in every sense of confronting the gang" and that it was "widely known that MS 13 expansion is aided by the gang's alliance with sectors of

the local police forces." The IJ further concluded that "[v]iolence is perpetuated not only by criminal groups, but also by agents of the state, such as the police and the military" and "[t]here were several reports that the government or its agents committed arbitrary or unlawful killings . . . during law enforcement operations or . . . other criminal activity by government agents." The BIA also acknowledged that Honduran officials have been fighting a losing battle against gangs and therefore may be unable to offer Tabora Gutierrez protection from gangs. This is because, in many cases, it is the Honduran authorities themselves who are corrupt and complicit with the gangs in their illegal activities.

In the face of this record, the majority affirmed the BIA's finding that Tabora Gutierrez had failed to demonstrate the requisite governmental acquiescence to any torture he would experience upon his return to Honduras because "Honduras is not willfully blind to th[e] 'endemic corruption' and is taking meaningful steps to address these problems." This finding was made despite the IJ's seemingly inconsistent finding that the "Honduran government's attempts at curtailing corruption and gang violence have been unsuccessful" as the reform efforts have made little progress.

## B.

In sum, the IJ credited petitioner's testimony that he was attacked by MS-13 on at least three occasions, and the police failed to investigate or otherwise intervene to protect him. No evidence was produced showing that the state actors had an acceptable reason (such as lack of resources) for refusing to do their duty.[3] The record supports two possible explanations for

---

[3] Remember that only one of the police departments petitioner sought help from gave any explanation for its failure to act. That excuse was that petitioner did not provide "enough proof." After petitioner reported that he and his wife had been shot by MS-13,

No. 19-60408

the failure of four police departments and a prosecutor's office to investigate and make some effort to intervene in petitioner's torture by MS-13 gang members: The most likely is corruption, which the IJ found was widespread. Second was lack of will or courage to do their duty (supported by the representation of the prosecutor's office). An officer who is corrupted by the torturer is effectively an aider and abettor of the torturer.[4] No one argues that this is a justification for failing to intervene. We have found no case supporting the majority's apparent conclusion that lack of will or courage by an officer is an acceptable reason for the officer's failure to intervene.

Moreover, the cases that the majority cites in support of its conclusion are easily distinguishable from the case at hand. In *Ramirez-Mejia v. Lynch*,[5] the petitioner was found ineligible for CAT relief because unlike the instant case, the petitioner failed to prove he more likely than not would be tortured if removed. The court also found that the police arrested one of the gang members and insisted that the petitioner file a complaint against him.[6] In *Martinez Manzanares v. Barr*,[7] the petitioner did not meet CAT eligibility

---

one police department referred him to a prosecutor. The other did nothing, and gave no excuse for its inaction.

[4] A "rogue" police officer who is a participant in the torture "satis[ies] CAT's requirement that a public official acquiesce in the torture, even if [higher government officials] . . . would not similarly acquiesce." *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1139 (7th Cir. 2015); *see also Mendoza-Sanchez v. Lynch*, 808 F.3d 1182, 1185 (7th Cir. 2015) (stating that it does not "matter if the police officers who will torture [the petitioner] if he's forced to return to Mexico are rogue officers individually compensated by [a gang member] to engage in isolated incidents of retaliatory brutality, rather than evidence of a broader pattern of governmental acquiescence in torture") (internal quotation marks and citation omitted).

[5] 794 F.3d 485, 487, 494 (5th Cir. 2015).

[6] *Id.* at 494.

[7] 925 F.3d 222, 224, 228 (5th Cir. 2019).

because he suffered no past torture and did not ever report the threats he allegedly received to the police. The court also found that the police arrested and intended to prosecute the petitioner's primary torturer.[8] Finally, in *Tamara-Gomez v. Gonzales*,[9] the petitioner failed to show government acquiescence because the government allowed the petitioner to live on a military base for his protection from FARC, a terrorist guerilla group, and found that "the Columbian government . . . [was] fully engaged in opposition to FARC."

If the egregious facts in this case are not sufficient to support a finding of public-official acquiescence, CAT relief will be a dead letter to most if not all individuals who live in countries where the police are corrupt or simply do not have the will or courage to protect them from brutal gang attacks. I therefore respectfully dissent.

---

[8] *Id.* at 229.

[9] 447 F.3d 343, 346, 351-52 (5th Cir. 2006).